UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CELESTE M. PANAGOPOULOS,

                          Plaintiff,

                                                    1:13-CV-0459
v.                                                  (GTS/DJS)

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION,

                          Defendant.
_____

APPEARANCES:                              OF COUNSEL:

THE DeLORENZO LAW FIRM, LLP                CORY ROSS DALMATA, ESQ.
   Counsel for Plaintiff
670 Franklin Street, Suite 100
Schenectady, NY 12305

ERIC T. SCHNEIDERMAN                       RACHEL M. KISH, ESQ.
Attorney General for the State of New York  Assistant Attorney General
   Counsel for Defendant
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment discrimination action filed by Celeste

Panagopoulos ("Plaintiff") against the New York State Department of Transportation ("DOT" or

"Defendant"), is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt.

No. 24.)  For the reasons set forth below, Defendant's motion is granted.

# I.     RELEVANT BACKGROUND

## A.     Plaintiff's Complaint

Generally, in her Complaint, Plaintiff, a 48 year-old female who began working for DOT in April 2001 and DOT's only female Information Technology Manager, alleges that, starting at some point in 2008 and continuing to the present time, she has been discriminated against by DOT employee Patrick Bennison on the basis of her gender, and, after she filed grievances related to that discrimination, she was subjected to retaliatory discrimination.  (Dkt. No. 1 [Plf.'s Compl.].)  For example, Plaintiff alleges that: (1) Bennison "maliciously accused" her of stealing a parking sticker and directed employees to sit outside of her office to harass and annoy her, (2) she was abruptly reassigned to another position, placing her a greater risk of a layoff based upon a lack of seniority in her new role, and (3) after she filed a grievance, she was issued a notice of discipline and required to appear for an interrogation.  (*Id.* at ¶¶ 17-25.)  Because this Decision and Order is intended primarily for the review of the parties, the Court will not recite in detail the remaining factual allegations of Plaintiff's Complaint but will refer the reader to the Complaint.  (*Id.*)

Based upon these factual allegations, Plaintiff's Complaint asserts three claims, set forth in two "Causes of Action": (1) a claim of gender discrimination in violation of the New York State Human Rights Law ("NYSHRL"), New York Executive Law §§ 296 and 297; (2) a claim of retaliation in violation of New York Executive Law §§ 296 and 297 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and (3) a claim that Defendant subjected her to a hostile work environment in violation of the NYSHRL and Title VII.  (*Id.* at ¶¶ 27-36.)

**B.      Undisputed Material Facts**

Except where otherwise noted, the following facts were asserted and supported by an accurate record citation by Defendant in its Rule 7.1 Statement and either expressly admitted or denied without an accurate record citation by Plaintiff in her Rule 7.1 Response.  (*Compare* Dkt. No. 24, Attach. 2 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 32, Attach. 2 [Plf.'s Rule 7.1 Response].)

**1.      Plaintiff's Background with DOT**

Plaintiff has worked for DOT since 2001.  (Dkt. No. 24, Attach. 2, at ¶ 1.)  In 2007, she was promoted to the position of Information Technology Specialist 3 ("ITS 3"), a position in which she was expected to supervise or perform a broad array of information technology ("IT") support activities with regard to DOT's network and database systems.  (*Id.* at ¶¶ 2-3.)[1]  The same year, Plaintiff left DOT for six months and took a position in customer relations with the New York State Office for Technology.  (*Id.* at ¶ 5.)  She returned to DOT in early 2008, retaining the title of ITS 3.  (*Id.* at ¶¶ 6-7.)  Although her title remained the same, functionally Plaintiff assumed the role of Regional IT Manager, in which she oversaw IT operations in DOT's Schenectady, New York regional office, known as "Region 1."  (*Id.* at ¶¶ 6-7.)[2]  In that role, Plaintiff was responsible for supervising Region 1 IT staff, coordinating resources, and handling remote IT support for approximately 35 to 40 sites.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 8

---

[1]      An ITS 3 is responsible for, among other things, supervising agency help desk operations, reviewing and recommending hardware, software, and maintenance services, and implementing security procedures and protocols.  (*Id.* at ¶ 4.).

[2]      Region 1 includes Essex, Warren, Washington, Saratoga, Rensselaer, Albany, Schenectady, and Greene Counties.  (Dkt. No. 24, Attach. 27, at 48 [attaching as "Exhibit I" Plf.'s Depo. Tr.].)

[Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 8 [Plf.'s Rule 7.1 Response, admitting the fact asserted and purporting to deny a fact not expressly asserted or implied by Defendant without a specific citation to the record].)  Regional IT Managers were also responsible for managing IT service tickets.  (Dkt. No. 24, Attach. 2, at ¶ 10.)  Plaintiff was one of eleven Regional IT Managers, and the only female.  (Dkt. No. 33 at ¶ 4 [Plf.'s Aff.]; Dkt. No. 24, Attach. 29, at 14 [attaching as "Exhibit K" Robert Lewis's Depo. Tr.].)

## 2.    IT Management Hierarchy

In 2008, Regional IT Managers reported to Robert Lewis, Manager of Information Technology Procurement and Regional IT.  (Dkt. No. 24, Attach. 2, at ¶ 11.)  Lewis, in turn, reported to Patrick Bennison, Director of Statewide Customer Support.  (*Id.* at ¶ 12.)  Bennison had previously held the position of Regional IT Manager for Region 1 for ten years, and, during that time, he developed strong professional relationships with the users situated in Region 1.  (*Id.* at ¶¶ 13-14.)  Bennison maintained those relationships and continued to receive email messages from Region 1 users regarding IT issues even after he left the position of Regional IT Manager.  (*Id.* at ¶ 16.)

The position of Regional IT Manager for Region 1 was vacant for a period of time prior to Plaintiff's assignment to that position in 2008.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 17 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 17 [Plf.'s Rule 7.1 Response, denying only a portion of the fact asserted and not supporting that denial with a specific citation to the record where the purported factual issue actually arises].)  During that period of time, IT support was managed

from the DOT main office, located at 50 Wolf Road in Albany, New York. (Dkt. No. 24, Attach. 2, at ¶ 18.) Moreover, in 2005, Region 1's data centers were relocated to the DOT main office. (*Id.*, ¶ 19.)

### 3. Issues Following Plaintiff's Appointment as Regional IT Manager

At some point after Plaintiff was appointed to the position of Regional IT Manager, Bennison began receiving phone calls from customers who complained about the quality of IT services being provided to Region 1 users. (*Compare* Dkt. No. 24, Attach. 2, at ¶ 21 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 21 [Plf.'s Rule 7.1 Response, admitting that Bennison testified in accordance with the fact asserted, but denying the assertion "as Plaintiff has no knowledge as to whether . . . Bennison received said phone calls," and not supporting that denial with a specific citation to the record where a factual dispute actually arises].) Some complaints also concerned users' inability to locate or contact Plaintiff. (Dkt. No. 24, Attach. 2, at ¶ 23; Dkt. No. 24, Attach. 29, at 46-47 [Attaching as "Exhibit K" Lewis's Depo. Tr.].) Finally, he also became concerned about the number of open service tickets in Region 1. (Dkt. No. 24, Attach. 30, at 26-27 [Attaching as "Exhibit L" Bennison's Depo. Tr.].)

Meeting on August 25, 2008

On August 25, 2008, Bennison and Lewis met with Plaintiff. (Dkt. No. 24, Attach. 2, at ¶ 26.) At the meeting, Bennison informed Plaintiff that she should be spending the majority of her time at the regional office rather than at remote locations; Plaintiff responded that this would not be conducive to Region 1 and the manner in which it was conducting business at the time, and that "things had changed" since Bennison's tenure as Regional IT Manager. (*Id.* at ¶¶ 27-29;

Dkt. No. 24, Attach. 25, at 11 [Attaching as "Exhibit H" Plf.'s Resps. to Interrogs.].)  Moreover, Bennison advised Plaintiff that "walk-in" customers seeking assistance were to be provided with service at the time that they walked in; Plaintiff expressed concern that this would allow walk-in customers to "move to the front of the line."  (Dkt. No. 24, Attach. 2, at ¶¶ 30-31.)  Bennison informed Plaintiff that he wanted Region 1 to begin holding "subject expert meetings"; Plaintiff responded that she needed to first seek approval from the DOT Regional Director.[3]  (*Id.* at ¶¶ 32-33.)  In short, Plaintiff did not agree with solutions that Bennison proposed at the meeting.  (*Id.* at ¶ 34.)  Bennison abruptly exited the meeting.  (*Id.* at ¶ 36.)  Plaintiff later referred to the August 2008 meeting as the "catalyst" for the future problems she allegedly experienced, inasmuch as she and Bennison had previously gotten along.  (*Id.* at ¶ 149; Dkt. No. 24, Attach. 27, at 114-15 [attaching as "Exhibit I" Plf.'s Depo. Tr.].)

After the August 2008 meeting, Bennison concluded that IT service within the region had not improved because he continued to receive phone calls from customers concerning the low quality of IT support.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 37 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 37 [Plf.'s Rule 7.1 Response, admitting that record testimony supports the factual assertion and then purporting to deny the factual assertion because Plaintiff has "no knowledge" of its truth and providing no citation to the record];[4] Dkt. No. 24, Attach. 30, at 37-40 [attaching

---

[3]	According to Plaintiff, a subject expert meeting is a meeting in which "[s]omeone from the region who is knowledgeable in a particular area makes [a] presentation which explains a certain field or area of work" on "a multitude" of topics.  (Dkt. No. 24, Attach. 25, at 12-13 [Attaching as "Exhibit H" Plf.'s Resps. to Interrogs.].)

[4]	*See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015

as "Exhibit L" Bennison's Depo. Tr.].)  On September 19, 2008, Lewis informed Plaintiff that a Region 1 customer had complained about Plaintiff's absence from the Region 1 main office. (*Compare* Dkt. No. 24, Attach. 2, at ¶ 38 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 38 [Plf.'s Rule 7.1 Response, admitting portion of the factual assertion, then purporting to deny assertion to the extent that she has "no knowledge" of the origins of the complaint and providing no citation to the record].)  Lewis also reminded Plaintiff she should be spending the majority of her time at the regional office and instructed her that she was required to inform him by email message if she had to leave and for how long she expected to be out of the office.  (Dkt. No. 24, Attach. 2, at ¶¶ 39-40.)  Lewis suggested that Plaintiff leave a note on her desk or wherever it might be seen by anyone looking for her.  (*Id.* at ¶ 41.)

In November 2008, Plaintiff was informed that another complaint had been received from a Region 1 customer regarding Plaintiff's absence from the Region 1 office.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 42 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 42 [Plf.'s Rule 7.1 Response, admitting the fact asserted and then purporting to deny knowledge of an implied fact not expressly asserted without specific and accurate record citation].)  On November 12, 2008,

---

WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'"); *Davis v. City of Syracuse.*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute.").  It is axiomatic that, for purposes of a statement of material facts, the summary judgment record includes depositions (which Defendant cited in support of this factual assertion.) N.D.N.Y. L.R. 7.1(a)(3) ("The record for purposes of the Statement of Material Facts includes . . . depositions . . . .").

Plaintiff received an email message from Lewis (forwarding an earlier email message from Bennison to Lewis), noting that there were an unacceptably high number of open or unresolved service tickets in Region 1 compared to other regions. (*Id.* at ¶ 43.) On December 16, 2008, Lewis informed Plaintiff by email message that more than 25% of the tickets in Region 1's "incident queue," and nearly 40% of tickets in the "change queue," had not been assigned. (*Id.* at ¶ 44.) Lewis directed Plaintiff to address the unassigned tickets and, in a subsequent email message sent on January 5, 2009, requested again that Plaintiff resolve the problem. (*Id.* at ¶¶ 45-46.) In the latter email message, Lewis also observed that "no tickets [were] assigned to" Plaintiff's name in the "incident queue." (Dkt. No. 24, Attach. 15, at 843 [attaching as part of "Exhibit F" email message, dated Jan. 5, 2009].) Lewis found this fact "particularly troubling in light of" concerns that Plaintiff had previously conveyed to Lewis about staffing in Region 1; to Lewis, the incident queue suggested that "either the region is actually *over*staffed or [Plaintiff's] time in particular is under-utilized." (*Id.*)[5]

In an email message sent on January 15, 2009, Bennison advised Plaintiff that she should have kept her supervisor (Lewis) "in the loop" regarding a particular IT service request made by a customer. (Dkt. No. 24, Attach. 2, at ¶ 47; Dkt. No. 24, Attach. 25, at 21 [attaching as "Exhibit H" Plf.'s Resps. to Interrogs.].) With regard to the difficulties that she felt she was having with Bennison, Plaintiff told Lewis that she "thought it would be helpful if [Lewis] did not respond as a puppet but actually looked into the merit of the stuff [she] was getting slammed with to determine if it was even valid." (Dkt. No. 24, Attach. 2, at ¶ 48; Dkt. No. 24, Attach. 25, at 23

---

[5] More than two years later, on or around March 23, 2011, Torry Bisnett, an employee at DOT's main office, was temporarily assigned to Region 1 for the limited purpose of assisting with the existing backlog of IT service tickets. (Dkt. No. 24, Attach. 2, at ¶ 100.)

8

[attaching as "Exhibit H" Plf.'s Resps. to Interrogs.].)  In an email message dated January 23, 2009, Lewis informed Plaintiff that someone (who was not identified) suggested to Lewis that he warn Plaintiff regarding inappropriate comments that she had made to Lewis.  (Dkt. No. 24, Attach. 15, at 850-51 [attaching as part of "Exhibit F" email message, dated Jan. 23, 2009].)  Lewis acknowledged that he had previously told Plaintiff that she was "free to say whatever was on [her] mind" and thus invited her frank remarks, and directed that, if future meetings became "contentious," he and Plaintiff continue their meeting outside the presence of third parties.  (*Id.* at 850-51.)  However, Lewis stated that "[t]he only thing [he] thought was out of line" was "the comment about being a 'puppet.'"  (*Id.* at 849.)

<u>Counseling Session of March 5, 2009</u>

On or around March 5, 2009, Lewis counseled Plaintiff regarding two separate issues.  (Dkt. No. 24, Attach. 2, at ¶¶ 49-50.)  First, Lewis counseled Plaintiff regarding her failure to provide timely notifications to the main office about the status of a technical issue related to cellular telephones.  (*Id.* at ¶ 49; *see also* Dkt. No. 24, Attach. 16, at 869 [attaching as part of "Exhibit F" email message from Lewis to Plaintiff, dated Mar. 6, 2009, reiterating earlier discussion that Plaintiff "be more vigilant in getting important communications out to the various stakeholders on a timely basis" and noting that "not overcoming [such situations] will lead to bigger problems later on down the road and I think neither one of us want that to happen"].)  Second, Lewis counseled Plaintiff regarding her failure to inform Lewis about a situation involving one of Plaintiff's employees, leaving Lewis "and the rest of ITD at a disadvantage because [they] didn't know what was going on."  (Dkt. No. 24, Attach. 2, at ¶ 50.)

<u>2009 Performance Plan</u>

On or about July 21, 2009, Plaintiff received from Lewis a "performance plan"–a plan identifying tasks and objectives of job duties and standards for measuring performance. (Dkt. No. 24, Attach. 2, at ¶ 53; Dkt. No. 24, Attach. 13, at 582.) Plaintiff has reviewed the performance plans of two other Regional IT Managers, and has described her July 2009 performance plan as "similar" to her performance plan for the previous year and the performance plans distributed to other Regional IT Managers. (Dkt. No. 24, Attach. 2, at ¶¶ 54-56.) However, unlike other performance plans, Plaintiff's performance plan did not contain tasks and standards related to the maintenance of backup and server functions. (*Id.* at ¶ 57.)

<u>Use of State Vehicle</u>

On August 28, 2009, Lewis sent an email message to Plaintiff, informing her that the New York State vehicle assigned to Region 1 was being considered as a candidate for transfer to another region in need of a vehicle because it was rarely used in Region 1. (Dkt. No. 24, Attach. 2, at ¶ 59; Dkt. No. 24, Attach. 16, at 895 [attaching as part of "Exhibit F" email message from Lewis to Plaintiff, dated Aug. 28, 2009].) At the direction of Bennison, Lewis asked Plaintiff to generate a report regarding occasions on which she had used her personal vehicle for business when the State vehicle was not available. (Dkt. No. 24, Attach. 16, at 895.) On September 9, 2009, Bennison sent an email message to all Regional IT Managers, discussing DOT's policy concerning the usage of personal vehicles while making service calls. (Dkt. No. 24, Attach. 2, at ¶ 61; Dkt. No. 24, Attach. 16, at 906 [attaching as part of "Exhibit F" email message from Bennison to Regional IT Managers, dated Sept. 9, 2009, noting that it is "department policy to use a state vehicle unless one is not available" or a service visit location was "on [the] way home"].)

<u>Email Program Update</u>

On December 18, 2009, Bennison sent an email message to all Regional IT Managers, indicating that he wanted to spend a portion of a scheduled conference call addressing concerns about an impending update to the email program used by DOT staff. (Dkt. No. 24, Attach. 2, at ¶ 65.) In sending that email message, Bennison also forwarded an earlier email message he had sent to Plaintiff in which he advised her that she "need[ed] to keep up to date on" the "concerns" people had; those concerns "ha[d] been talked about at length at various [IT] manager con[ference] calls" and thus "should have been taken care of" within Region 1. (Dkt. No. 24, Attach. 16, at 922 [attaching as part of "Exhibit F" email message from Bennison to Plaintiff, dated Dec. 18, 2009].) In a subsequent email message sent to Mary Ivey, the Regional Director of Region 1, Bennison explained some of the advantages of migrating to a new email program; in so doing, Bennison forwarded an earlier email message he had sent to two other Region 1 staff members in which he expressed that he was "disappointed that some of our [IT] managers have been failing to get the message out there" regarding the email program's capabilities. (Dkt. No. 24, Attach. 2, at ¶ 66; Dkt. No. 24, Attach. 16, at 920-21 [attaching as part of "Exhibit F" email message, dated Dec. 24, 2009].) Bennison also requested that Plaintiff be provided "Outlook training and EHA training[.]" (*Id.* at 920.)

<u>DOT Training Center IT Responsibilities</u>

In December 2009, Plaintiff was informed that Region 1's IT Group would be assuming IT support responsibilities for the DOT Training Center located at the main office. (Dkt. No. 24, Attach. 2, at ¶ 64.) On March 31, 2010**,** Lewis informed Plaintiff about a complaint that had been received regarding a lack of IT support coverage at the Training Center. (*Id.* at ¶ 67.)

Plaintiff explained that a member of the staff "was in and out of the training center all week," and Lewis responded that the complaint "was that 'nobody from IT ever showed up.'" (Dkt. No. 24, Attach. 16, at 927 [attaching as part of "Exhibit F" email messages dated Mar. 31, 2010].) Lewis observed that "[t]he complaints coming in, whether right or wrong, are coloring the opinion of the capabilities of IT in the region and the management thereof . . . . I think you'd be well advised to ensure that coverage there is a high priority at all times." (*Id.*) In another exchange between Lewis and Plaintiff in April 2010, also concerning IT support coverage at the Training Center on particular dates, Lewis explained to Plaintiff that, "[a]s the manager for Region 1 IT, you should be coming up with a way to provide that coverage." (Dkt. No. 24, Attach. 16, at 936 [attaching as part of "Exhibit F" email messages dated Apr. 20, 2010].) Although he expressed an awareness that Plaintiff was displeased that she and her staff (as opposed to personnel located at the main office) were responsible for ensuring the Training Center's IT needs were met, Lewis emphasized to Plaintiff that, "if [she] can take the bull by the horns and manage this . . . [she will] be doing [her]self a favor and showing [her] ability to manage." (*Id.*) In December 2010, Lewis questioned Plaintiff again about why no IT staff was present at the Training Center during a scheduled meeting. (Dkt. No. 24, Attach. 2, at ¶ 76.)

<u>Plaintiff's Use of a DOT Parking Sticker</u>

On November 22, 2010, Lewis informed Plaintiff that "complaints" had been received concerning Plaintiff's use of a reserved parking sticker and/or reserved parking area located at the main office, and that any further such parking would require him to "write [her] up." (Dkt. No. 24, Attach. 2, at ¶ 71; Dkt. No. 24, Attach. 16, at 942-43 [attaching as part of "Exhibit F" email messages dated Nov. 22, 2010].) Two days later, Bennison sent Plaintiff an email message

in which he stated that he had "asked the Investigations Unit" to verify a photograph of the permit that Plaintiff provided to Lewis. (Dkt. No. 24, Attach. 16, at 945 [attaching as part of "Exhibit F" email message from Bennison to Plaintiff, dated Nov. 24, 2010].) Bennison asserted that no record of the parking permit had been found, which indicated that it was assigned to an employee who was no longer in state service; he also noted that the permit sticker appeared to be "curled" due to "removal from the original person's car that [it] was assigned to." (*Id.*)

Plaintiff explained that she had received the parking permit in 2005 or 2006 as a reward for her work on the State Employee Federated Appeal campaign. (Dkt. No. 24, Attach. 2, at ¶ 72.) However, pursuant to DOT main office parking procedures, she had been required to return the permit when she had left the main office in January 2008. (*Id.* at ¶ 73.) Plaintiff had used the permit to park in restricted areas at the main office between 2008 and November 2010, but had not been subjected to disciplinary action as a result. (*Id.* at ¶¶ 74-75.)

On November 24, 2010, Plaintiff forwarded Bennison's email to Lewis and asserted that she intended to file "a hostile work environment claim" against Bennison. (Dkt. No. 24, Attach. 16, at 948 [attaching as part of "Exhibit F" email message dated Nov. 24, 2010].) Plaintiff stated that her "integrity has been questioned for the last time," and that she found Bennison's behavior "degrading to the point that [she] had no choice" but to "step up to address" the issues in the hope of causing "DOT management to realize just what they've unleashed upon its staff." (*Id.*)

In an November 29, 2010, email message to Richard Keefer (a member of DOT's Employee Relations Bureau), Plaintiff explained the basis upon which she received the parking sticker and noted that she "appreciate[d]" Keefer's assistance "with the ongoing issue [she has] had with Pat Bennison." (Dkt. No. 24, Attach. 16, at 949 [attaching as part of "Exhibit F" email

message dated Nov. 29, 2010].)  Plaintiff further stated that her "issues" with Bennison had "been ongoing for some time, and advised that two other individuals–Jan Brown and Ivey–may "be able to validate the 'treatment'" she received from Bennison.  (*Id.*)  Plaintiff noted Bennison had "quite vocally belittled" her in front of other DOT staff, including other Regional IT Managers, and "had tirades" in which he "called [her] names[.]"  (*Id.*)

DOT Employee Cellular Phone Upgrade

In December 2010, DOT began the process of upgrading employees' cellular phones. (Dkt. No. 24, Attach. 2, at ¶ 77.)  During that process, a Region 1 customer's telephone contacts were lost because Plaintiff failed to follow procedures established before the upgrade.  (*Id.* at ¶ 78.)  There were no other complaints or issues reported in any other region, and every other region followed the established upgrade process.  (*Id.* at ¶ 79.)  In an email message to Lewis and Plaintiff regarding this issue, Bennison stated, "This is unacceptable."  (Dkt. No. 24, Attach. 17, at 972 [attaching as part of "Exhibit F" email messages, dated Dec. 10, 2010].)  In an email message in response, Plaintiff stated, "What it is, Pat, is a crock of poop.  I would very much appreciate you reaching out to me to find out what really happened versus assuming immediate guilt."  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 80 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 80 [Plf.'s Rule 7.1 Response, asserting that Plaintiff "is unable to admit or deny the allegation" with no further explanation and without any record citation].)  Lewis responded that Plaintiff's email message was "out of line" and noted that Region 1 IT staff "have an obligation to do right by [its] customers . . . who are dissatisfied."  (Dkt. No. 24, Attach. 17, at 974-75 [attaching as part of "Exhibit F" email message, dated Dec. 20, 2010].)

14

<u>Counseling Session of February 18, 2011</u>

On or about February 17, 2011, Lewis informed Plaintiff by email message that he was "having a very difficult time seeing [Plaintiff's frequent failure to respond to his questions and directives] as anything short of open insubordination." (Dkt. No. 24, Attach. 2, at ¶ 82; Dkt. No. 24, Attach. 17, at 986-87 [attaching as part of "Exhibit F" email message, dated Feb. 17, 2011].) Lewis stated that he intended to commence a "formal counsel[ing] session at [his] earliest convenience." (Dkt. No. 24, Attach. 17, at 987.) The counseling session was apparently scheduled for the following day, but Plaintiff failed to appear for the session or to inform Lewis that she would not be present. (*Id.* at 988.) In an email message to Lewis, sent after the scheduled time for the counseling session, Plaintiff explained that "she was not meeting with [Bennison] without [u]nion representation [or] someone from Employee Relations."[6] (*Id.* at 988.) Lewis responded that Bennison had no intention of attending the meeting. (*Id.*)

On March 4, 2011, Plaintiff met with Amelia Dilella, DOT's Director of Employee Relations, and David Harris, another member of the employee relations staff, to discuss her concerns regarding Bennison. (Dkt. No. 24, Attach. 2, at ¶¶ 84, 87.) At that meeting, Harris offered to attend future monthly meetings involving Plaintiff and DOT executive staff members (including Bennison), but Plaintiff declined the offer. (*Id.* at ¶ 88.) At the conclusion of the meeting, Plaintiff stated that she would provide Harris with further documentation regarding her interactions with Bennison, but Plaintiff had no further contact with the employee relations bureau until August 2011. (*Id.* at ¶ 90.)

---

[6]     Plaintiff previously had conversations and email correspondence with Geraldine Smith, the former DOT Director of Employee Relations, to discuss her relationship with Bennison and to obtain advice in that regard. (Dkt. No. 24, Attach. 2, at ¶ 85.) Plaintiff's written communications with Smith made no reference to sex or gender discrimination. (*Id.* at ¶ 86.)

<u>Monthly IT Meetings</u>

From March 2011 through June 2011, monthly meetings were held between Ivey, Nancy

Mulholland (DOT's Chief Information Officer), Bennison, Lewis, and Plaintiff.[7]  (*Id.* at ¶ 91;

Dkt. No. 24, Attach. 31, at 6 [attaching as "Exhibit M" Nancy Mulholland's Depo. Tr].)  During

at least one of these meetings, Bennison became angry and left the room.  (*Compare* Dkt. No.

24, Attach. 2, at ¶ 95 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion

with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 95 [Plf.'s Rule 7.1 Response,

denying the fact asserted without a record citation]; Dkt. No. 24, Attach. 29, at 58-59, 76

[attaching as "Exhibit K" Lewis's Depo. Tr.].)  Lewis recalled "an ugly interchange" and that

Bennison "felt he was being argued with" by Plaintiff.  (Dkt. No. 24, Attach. 29, at 59.)

However, according to Lewis, "[t]here was never any outburst of yelling or fist pounding" at

these meetings.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 95 [Def.'s Rule 7.1 Statement, supporting

the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at

¶ 95 [Plf.'s Rule 7.1 Response, denying the fact asserted without citation to the record]; Dkt. No.

24, Attach. 29, at 80.)[8]

---

[7]    During his deposition, Lewis testified that the purpose of these meetings was to "clear the air and hopefully improve the relations between all of us."  (Dkt. No. 24, Attach. 29, at 58 [attaching as "Exhibit K" Lewis's Depo. Tr.].)

[8]    In her Responses to Defendant's Interrogatories, Plaintiff asserts that, in a March 2009 meeting between Plaintiff, Bennison, and Lewis regarding Plaintiff's handling of service tickets, Bennison arrived red in the face, his hands "shaking in rage."  (Dkt. No. 24, Attach. 25, at 49 [attaching as "Exhibit H" Plf.'s Resps. to Interrogs.].)  Plaintiff further asserts that, when she attempted to explain her course of action, Bennison "slammed his fist on the table" and told her to "shut up" because "there was no reason for [her] to open [her] mouth."  (*Id.* at 50.)

<u>Cellular Phone Upgrade and Distribution</u>

In early March 2011, Lewis advised Plaintiff that the completion of the regional employee cellular phone upgrade–which had begun in December 2010–needed to be treated as "a high priority." (Dkt. No. 24, Attach. 2, at ¶ 96.) On March 23, 2011, Lewis emailed Plaintiff concerning the lack of progress in that upgrade process. (*Id.* at ¶ 97; Dkt. No. 24, Attach. 17, at 1006 [attaching as part of "Exhibit F" email message, from Lewis to Plaintiff, dated Mar. 23, 2011, noting that, "nearly three weeks later . . . there are still 50+ phones left to be distributed" to employees and that Lewis would not "allow [him]self to be put into 'harm's way' if [Plaintiff was] not following explicit directives"].) In light of Region 1's lack of progress–and the fact the other regions had already completed the cellular phone upgrade–Lewis instructed Plaintiff to complete the upgrade by April 1, 2011, and to provide daily status updates regarding the upgrade. (Dkt. No. 24, Attach. 2, at ¶¶ 98-99; Dkt. No. 24, Attach. 17, at 1006].)

<u>Lewis's Observation of Region 1's Operations and Employee Rotation</u>

From March 2011 through May 2011, Lewis spent approximately two hours, on three or four separate occasions, observing IT operations in Region 1.[9] (Dkt. No. 24, Attach. 2, at ¶ 101.) During that period, in April 2011, Bennison and Lewis began rotating members of the Region 1 IT Group with IT staff from the main office. (*Id.* at ¶ 103.) This measure was taken, at least in part, to obtain a clearer understanding of the cause of problems with the delivery of IT support services in Region 1. (*Id.* at ¶ 104; Dkt. No. 24, Attach. 29, at 63-64 [attaching as "Exhibit K" Lewis's Depo. Tr.].) Simply stated, Lewis wanted to explore whether Region 1 had "overly

_____

[9]        According to Plaintiff, Lewis made these visits at the direction of Bennison and "s[a]t outside of [her] door" when he visited. (Dkt. No. 33 at ¶ 28 [Plf.'s Aff.].) Plaintiff testified during her deposition that Lewis had no ostensible purpose on these visits, which Plaintiff found "disruptive." (Dkt. No. 24, Attach. 27, at 147-48 [attaching as "Exhibit I" Plf.'s Depo. Tr.].)

whiney" customers, if Plaintiff was "not taking care of them properly," or if there was "a combination" of those factors.  (Dkt. No. 24, Attach. 29, at 63.)  The rotation of employees was discussed at a Region 1 IT staff meeting in April 2011; on May 2, 2011, Bennison informed Plaintiff that he intended to rotate a Region 1 staff member (Mike Fredette) into the main office, and keep Bisnett–who was still assisting Region 1 with its service ticket backlog–in place.  (*Id.* at ¶¶ 106-07.)

Plaintiff's Reassignment to the Main Office

In May or early June of 2011, Bennison and staff from the IT department and Employee Relations began discussing the possibility of reassigning Plaintiff to the main office to fill an operational need in the Information Security unit, which was managed by Charles Nagy. (*Compare* Dkt. No. 24, Attach. 2, at ¶ 108 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 108 [Plf.'s Rule 7.1 Response, admitting that this factual assertion was consistent with Bennison's statements in the record, then asserting that she cannot "admit or deny" the statement and attempting to assert fact non-responsive to Defendant's factual assertion].)  On or about July 21, 2011, Lewis and Bennison met with Plaintiff to inform her that she was being temporarily reassigned to the main office to fill the need in the Information Security unit.[10]  (*Id.* at ¶ 110.) The decision that Plaintiff would be reassigned was ultimately made by Mulholland.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 115 [Def.'s Rule 7.1 Statement, supporting the above-listed factual

---

[10]      Plaintiff created an audio recording of the meeting, as well as later conversations on that date.  (*Id.* at ¶ 111; Dkt. No. 24, Attach. 32 [attaching as "Exhibit N" Tr. of Audio Rec.].)  In one such conversation, Plaintiff stated that she would "be working for the most useless of f------ individuals, Charlie Nagy."  (Dkt. No. 24, Attach. 2, at ¶ 113; Dkt. No. 24, Attach. 32, at 69 [attaching page "19" of CD2].)  She also stated that it was "now [her] goal in life to f--- with" Bennison.  (Dkt. No. 24, Attach. 2, at ¶ 114; Dkt. No. 24, Attach. 32, at 92 [attaching page "16" of CD3].)

assertion with an accurate record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 115 [Plf.'s Rule 7.1

Response, denying the factual assertion without further explanation and not supporting that

denial with an accurate citation to the record where the purported factual dispute actually

arises].)[11]  During his deposition, Nagy testified that "there are occasions where folks are

reassigned to different duties based on the need of the organization."  (Dkt. No. 24, Attach. 28, at

29 [attaching as "Exhibit J" Charles Nagy's Depo. Tr.].)[12]

Plaintiff's poor management of the IT needs in Region 1 was also a factor in her

reassignment to the DOT main office.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 118 [Def.'s Rule

7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with*

Dkt. No. 32, Attach. 2, at ¶ 118 [Plf.'s Rule 7.1 Response, asserting that Plaintiff "cannot admit

or deny the truth of this allegation" with no further explanation and without any record citation].)

Lewis testified that the circumstances surrounding Plaintiff's reassignment, aside from

operational need, included "many complaints" from users, "mounting issues," "some clashing

going on between [Plaintiff] and one of her staff," and an "impending consolidation of the

Region 1 offices from Schenectady to the main office," which was "in the works" at the time.

(Dkt. No. 24, Attach. 29, at 62 [attaching as "Exhibit K" Lewis's Depo. Tr.].)  The IT support

---

[11]      In support of her conclusory denial of Defendant's factual assertion, Plaintiff cites pages 36-37 of Mulholland's deposition transcript.  (Dkt. No. 32, Attach. 2, at ¶ 115).  In the cited pages, Mulholland is asked whether she recalled, during her time as Chief Information Officer, "any lateral transfers, employees *from region to region?*"  (Dkt. No. 24 Attach. 31, at 36 [attaching as "Exhibit M" Mulholland's Depo. Tr.] [emphasis added].)  Mulholland stated, "I don't recall."  (*Id.*)  Mulholland testified that, in the case of such a transfer, she "would probably be advised and possibly consulted.  I just don't recall."  (*Id.*)

[12]      In an affidavit filed in opposition to Defendant's motion for summary judgment, Plaintiff asserts that she was reassigned to Nagy's unit despite having "no relevant training or experience" for that work.  (Dkt. No. 33 at ¶ 33 [Plf.'s Aff.].)

duties in Region 1 were redistributed to the IT Group's remaining employees, and management responsibilities were absorbed by the main office and overseen by Kathy Charron (a female). (Dkt. No. 24, Attach. 2, at ¶ 119.)

Plaintiff was originally told on July 21, 2011, that she had "a couple of hours" to clean out her office at Region 1 and to report to the main office; however, the following day, her start date was modified to August 11, 2011. (*Id.* at ¶¶ 121-22.) Her job title, salary, and benefits remained the same following her reassignment to the main office. (*Id.* at ¶ 124.) In conjunction with her reassignment, Plaintiff's access to certain IT systems, used in her role as Regional IT Manager, were removed; several of those accesses were later restored. (*Id.* at ¶¶ 125-26.) Plaintiff did not report for work on August 11, 2011, and the Blackberry device that she was assigned in relation to her Region 1 duties was remotely wiped for security reasons. (*Id.* at ¶ 127.) She was absent from that date until approximately September 19, 2011. (*Id.* at ¶ 129.) From July 2011 through September 2011, Plaintiff was trying to "burn up" her accrued personal time so that she did not lose it in the event that she was laid off. (*Id.* at ¶ 130.)[13]

Before she began her reassignment, Plaintiff was told that she would be sitting in an office cubicle, which she believed was "excessively small" given her pay grade and more appropriate for printer hardware or consultant staff. (*Id.* at ¶ 131.) In any event, Plaintiff never actually worked in that space. (*Id.* at ¶ 132.) During her deposition, Plaintiff testified that,

<hr>

[13]     In a letter dated September 28, 2011, DOT informed Plaintiff that, "[d]ue to serious fiscal problems now facing New York State and [her] union's failure to ratify a negotiated contract," a reduction in force was planned and Plaintiff's position was targeted for layoff, effective October 19, 2011. (Dkt. No. 24, Attach. 7, at 27 [attaching as part of "Exhibit D" letter, dated Sept. 28, 2011].) The reduction in force was later suspended until November 4, 2011, as the result of a tentative contract between New York State and Plaintiff's union. (*Id.* at 26.) This was not the first notice of termination for fiscal reasons that Plaintiff had received; she was given the same notice of a reduction in force on June 30, 2011. That first notice was rescinded on July 18, 2011. (*Id.* at 31-32.)

before she began working at the main office, she emailed Nagy to request a different seating

location. (Dkt. No. 24, Attach. 27, at 240 [attaching as "Exhibit I" Plf.'s Depo. Tr.].) Plaintiff

was told that Bennison "approved getting [her] a more appropriately sized cubicle." (*Id.*)

Nagy was initially uncertain what tasks Plaintiff would be performing in his group. (Dkt.

No. 24, Attach. 2, at ¶ 134.) Nagy was informed that Plaintiff was being transferred "[t]o

support the unit," but because he was not given advance notice of her arrival, "it took some

reorganization to develop some job duties for her." (Dkt. No. 24, Attach. 28, at 42 [attaching as

"Exhibit J" Charles Nagy's Depo. Tr.].) On the day Plaintiff was informed of her reassignment,

Nagy provided her with reading materials in preparation for her new role. (Dkt. No. 24, Attach.

2, at ¶ 135.)

Union Contract Grievances

On or about August 18, 2011, the New York State Public Employees Federation ("PEF")

filed two union contract grievances on Plaintiff's behalf. (*Id.* at ¶ 139.) One grievance alleged

violations of Articles 33 and 36 of the union contract ("Discipline" and "No Discrimination"),[14]

respectively; the other alleged violation of Article 45 ("Benefits Guaranteed"), citing the

Workplace Violence Act and DOT's "Promoting a Positive Productive Workplace" policy. (*Id.*

at ¶ 140.) These were the first such grievances Plaintiff filed against Bennison (or, for that

matter, any DOT employee). (*Compare* Dkt. No. 24, Attach. 2, at ¶ 141 [Def.'s Rule 7.1

Statement, supporting the above-listed factual assertion with an accurate record citation] *with*

---

[14] In support of this contract grievance, Plaintiff alleged that Bennison had "engaged in discrimination based on [her] gender for at least a year." (Dkt. No. 24, Attach. 9, at 261 [attaching as part of "Exhibit D" Plf.'s State/PEF Grievance Form].) Plaintiff alleged that Bennison "has screamed at" her in the presence of others, "menaced" her, "made condescending remarks to [her] and about [her]" in front of staff, and "generally harassed her," which "amount[ed] to gender discrimination." (*Id.*) Moreover, Plaintiff alleged that "[t]he last straw" was her sudden reassignment to the main office, in conjunction with which her "access to work at Region 1" was closed off. (*Id.*)

21

Dkt. No. 32, Attach. 2, at ¶ 141 [Plf.'s Rule 7.1 Response, admitting the fact asserted and providing commentary with regard to a fact neither asserted nor implied and without a record citation].)

On October 5, 2011, and October 11, 2011, "Second Step" meetings were held in relation to the grievances. (Dkt. No. 24, Attach. 2, at ¶ 142.) At the meetings, C. Richard Gay, a member of DOT's Employee Relations Bureau, heard testimony from Plaintiff, PEF Field Representative Susan Radosh, Lewis, and Nagy. (*Id.* at ¶ 143.) In support of the grievances, Plaintiff also submitted extensive written material, some of which contained details, and pertained to events, not discussed at the review meetings.[15] (*Id.* at ¶¶ 144-45.) Gay conducted additional interviews with Mulholland and Bennison, and contacted Lewis and Nagy to obtain further information regarding Plaintiff's submissions. (*Id.* at ¶ 146.)[16] By written decisions, Gay denied both grievances, finding no evidence of discrimination or workplace violence.[17] (*Id.* at ¶¶ 147-48, 156.)

---

[15] In an email message to Gay (attached to which was the additional documentation), Plaintiff stated that she was aware that males, including Lewis, had "contentious moments with" Bennison, which were "not an uncommon thing." (Dkt. No. 24, Attach. 14, at 720 [attaching as part of "Exhibit F" email message, dated Oct. 14, 2011].) In support of her allegation of gender discrimination, Plaintiff distinguished the general contentiousness other (male) employees had experienced with Bennison from her own situation by noting that she was "the only woman IT Manager" and "was singled out." (*Id.*). Plaintiff asserted that she "didn't have contentious 'moments' but contentious 'years,'" and that she was subjected to "nitpicking" and oversight that other Regional Managers were not, such as "check[ing] in" and "post[ing]" cellular phone numbers so that attendance could be verified or she could be reached. (*Id.*)

[16] Moreover, in an email message to Gay, dated April 5, 2012, Mulholland explained that, at the time at issue, "reassignments [had] become a way of life and not an exception due to the economic conditions and their impact on the state budget and [DOT's] workforce." (Dkt. No. 24, Attach. 20, at 1336 [attaching as part of "Exhibit F" email message dated Apr. 5, 2012].)

[17] In the portion of his written decision addressing Plaintiff's grievance pursuant to Article 36 of the union contract, Gay concluded that, "although these two individuals did not interact together well in a workplace setting, that does not mean that Mr. Bennison discriminated based on gender." Dkt. No. 24, Attach. 13, at 627 [attaching as part of "Exhibit F" Decision, dated Sept. 30, 2013].) Gay also noted that "some of the actions complained of" did not originate with Bennison, and others "were associated with disagreements over work related issues, complaints or work backlog and deadline issues." (*Id.*)

## Supervisors' Views of Plaintiff's Work

Lewis described his working relationship with Plaintiff as "stressful at times[.]" (Dkt. No. 24, Attach. 29, at 19 [attaching as "Exhibit K" Lewis's Depo. Tr.]; Dkt. No. 24, Attach. 2, at ¶ 150.) By Lewis's account, many of the problems in Region 1 were the result of Plaintiff's failure to complete tasks in the manner in which she had been directed to complete them. (Dkt. No. 24, Attach. 2, at ¶ 151.) By comparison, Lewis rarely experienced "emergent issues" in relation to other regions during his time in management. (*Id.* at ¶ 152; Dkt. No. 24, Attach. 29, at 24-25 [attaching as "Exhibit K" Lewis's Depo. Tr.].) Lewis noted that he also sometimes had difficulty reaching Plaintiff during normal work hours at the Region 1 office or by cellular phone; this occurred "[f]requently enough for it to be a problem." (Dkt. No. 24, Attach. 2, at ¶¶ 153-54; Dkt. No. 24, Attach. 29, at 32.) Nagy also had difficulty managing Plaintiff, particularly with regard to her attendance and work product. (Dkt. No. 24, Attach. 2, at ¶ 155.)

## Events Beginning in November 2011

Beginning in November 2011, a series of overlapping events with respect to DOT's discipline of Plaintiff, and Plaintiff's efforts to vindicate the alleged discrimination to which she was subjected, occurred. On November 17, 2011, Plaintiff received notice from DOT's Employee Relations Bureau that she was required to appear for an interrogation meeting. (*Id.* at ¶ 157; Dkt. No. 24, Attach. 9, at 247 [attaching as part of "Exhibit D" Memorandum to Plf., dated Nov. 17, 2011, stating that the interrogation "concern[ed Plaintiff's] time and attendance and other matters pertaining to" her duties while working in Region 1].) Initially, the interrogation was deferred. (Dkt. No. 24, Attach. 2, at ¶ 158.)

On or about February 2, 2012, Plaintiff's reassignment to the main office became permanent.  (*Id.* at ¶ 160.)  The probability that Plaintiff would lose her job as a result of PEF union contract negotiations remained the same as when she had been merely temporarily reassigned to the DOT main office.  (*Id.* at ¶ 161.)

On or about February 6, 2012, Plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR"), alleging violations of the NYSHRL.  (*Id.* at ¶ 162; Dkt. No. 24, Attach. 23, at 1622-31 [attaching as part of "Exhibit G" Plf.'s Verified Compl. to NYSDHR].)  In her verified complaint, Plaintiff alleged she had been subjected to gender discrimination and retaliation since filing her union contract grievances.  (Dkt. No. 24, Attach. 23, at 1622.)  Plaintiff asserted that she had been treated differently than her male counterparts on several bases, including being assigned to "an inappropriately sized cubicle for [her] grade level," being accused of stealing a parking sticker, and being subjected to her direct supervisor (Lewis) sitting outside her office to monitor her.  (*Id.* at 1622-23.)  Moreover, Plaintiff asserted that, since she was reassigned to the main office, Bennison "regularly walks past [her] desk, staring at [her], smirking and laughing."  (*Id.* at 1623.)[18]

On March 5, 2012, Nagy counseled Plaintiff regarding her attendance and work habits. (Dkt. No. 24, Attach. *2*, at ¶ 165.)  At the meeting, Nagy informed Plaintiff that, since she was assigned to his group in August 2011, she had been absent nearly 60% of the time and that, on the days that she reported to work, she was frequently late and exhibited poor work habits.  (*Id.*

---

[18]     In her Responses to Interrogatories, Plaintiff identified four specific instances on which this had occurred.  Plaintiff asserted that, on October 13, 2011 and October 28, 2011, Bennison walked past Plaintiff's cubicle from the floor above, looked down, and "started laughing" and "smirking" as he passed.  (Dkt. No. 24, Attach. 26, at 53 [attaching as part of "Exhibit H" Plf.'s Resps. to Interrogs.].) Similarly, Plaintiff asserted that Bennison "snickered" at her as he passed her cubicle on November 4, 2011 and January 13, 2012.  (*Id.* at 54.)

at ¶ 166.)  The following day, Nagy provided Plaintiff with a counseling memorandum summarizing the issues that they had discussed.  (*Id.* at ¶ 167.)

The interrogation of which Plaintiff was notified in November 2011 was held on April 6, 2012, and was conducted by David Harris, DOT's Labor Relations representative.  (*Id.* at ¶ 168; Dkt. No. 24, Attach. 8, at 149-60 [attaching as part of "Exhibit D" Interrogation Trans., dated Apr. 6, 2012].)  Plaintiff was questioned about reported instances of absence and tardiness from May 2010 and forward.  (*Id.* at ¶ 169.)  Those instances were based upon eyewitness reports from other DOT employees.  (*Id.* at ¶ 170.)

On April 12, 2012, PEF filed a contract grievance on Plaintiff's behalf, alleging that Nagy's March 6, 2012, counseling memorandum amounted to discipline.  (*Id.* at ¶ 171.)

On April 25, 2012, in relation to the interrogation held on April 6, 2012, Plaintiff was issued a Notice of Discipline, which proposed to terminate her employment based upon findings that she offered a false instrument for filing and committed theft of services on four occasions in May and June of 2011 while employed as the Regional IT Manager of Region 1.  (*Id.* at ¶¶ 172-73; Dkt. No. 24, Attach. 8, at 166-67 [attaching as part of "Exhibit D" Notice of Discipline, dated Apr. 25, 2012].)

On June 7, 2012, Plaintiff's grievance with regard to Nagy's counseling memorandum was denied.  (*Id.* at ¶ 174.)

On June 20, 2012, Plaintiff filed an amended verified complaint with the NYSDHR, adding claims pursuant to Title VII.  (*Id.* at ¶ 177; Dkt. No. 24, Attach. 34 [attaching as "Exhibit P" Plf.'s Am. Verified Compl. to NYSDHR].)  In her amended verified complaint, Plaintiff asserted that "[f]ederal [s]tatus has been added to this case" and authorized NYSDHR to accept

the amended verified complaint on behalf of the Equal Employment Opportunity Commission ("EEOC"). (Dkt. No. 24, Attach. 34, at 2.) On February 6, 2013, Plaintiff received a "Right to Sue" letter from the EEOC. (Dkt. No. 24, Attach. 2, at ¶ 179; Dkt. No. 1, Attach. 2 ["Right to Sue" Letter].)[19]

On November 22, 2012, all IT positions within DOT–including Plaintiff's position–were transferred to the newly formed New York State Office of Information Technology Services. (Dkt. No. 24, Attach. 2, at ¶ 178.)

Dismissal of Plaintiff's Notice of Discipline

Plaintiff's Notice of Discipline was ultimately referred to arbitration and, on August 28, 2013, the arbitrator dismissed the charges on the basis that Plaintiff had not been provided with sufficient notice or a reasonable opportunity to address the allegation of theft of services. (*Id.* at ¶¶ 175-76; Dkt. No. 24, Attach. 33, at 7 [attaching as "Exhibit O" Opinion and Award, dated Aug. 28, 2013].) The arbitrator reasoned that Plaintiff was unable to defend herself because DOT did not conduct its interrogation until ten months after Plaintiff's alleged absences and/or tardiness. (Dkt. No. 24, Attach. 33, at 7.) However, the arbitrator noted that his "decision should not be read as indicating that [Plaintiff] was without fault." (*Id.* at 8.)

As of the date on which DOT filed its motion for summary judgment, Plaintiff remained employed as an ITS 3 with a salary of $85,000 per year and state benefits. (*Id.* at ¶ 180.) Plaintiff's salary has continually increased since 2008. (*Compare* Dkt. No. 24, Attach. 2, at ¶ 181 [Def.'s Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate

---

[19]     Plaintiff's "Right to Sue" letter from the EEOC reflects that the EEOC closed the file on Plaintiff's charge because she "wishes to pursue [the] matter in Federal District Court." (Dkt. No. 1, Attach. 2.)

record citation] *with* Dkt. No. 32, Attach. 2, at ¶ 181 [Plf.'s Rule 7.1 Response, admitting the fact asserted and asserting additional fact neither expressly nor impliedly asserted or disputed by Defendant].)

### C. Defendant's Motion for Summary Judgment

#### 1. Defendant's Construction of Plaintiff's Complaint

Defendant has moved for summary judgment to dismiss Plaintiff's Complaint. (Dkt. No. 24.) Before more closely examining the arguments asserted by Defendant on its motion, the Court must briefly address the claims asserted in Plaintiff's Complaint and the manner in which Defendant has construed Plaintiff's Complaint and framed its arguments on the present motion.

As is clear from a reading of its arguments in support of its motion, Defendant construes Plaintiff's Complaint as asserting three claims under Title VII: discrimination,[20] retaliation, and hostile work environment. (*See generally* Dkt. No. 24, Attach. 1 [Def.'s Memo. of Law].) Correspondingly, in opposition to Defendant's motion, Plaintiff argues that genuine issues of fact exist as to each of her claims, including whether she was subjected to discrimination (due to disparate treatment) under Title VII. (Dkt. No. 32, Attach. 1, at 19-21 [Plf.'s Opp'n Memo. of Law].)

---

[20] The Court notes that, with regard to what Defendant perceives to be Plaintiff' Title VII discrimination claim, Defendant advances four arguments: (1) any Title VII claim based upon acts that took place prior to August 25, 2011, are time-barred and the continuing-violation exception to the statute of limitations does not apply (Dkt. No. 24, Attach. 1 at 4-5 [Def.'s Memo. of Law]); (2) Plaintiff has not suffered a materially adverse employment action for purposes of Title VII (*id.* at 5-8); (3) the circumstances do not give rise to an inference of gender discrimination (*id.* at 8-10); and (4) Defendant had a valid, nondiscriminatory reason for the actions alleged (*id.* at 10-12). Defendant construes Plaintiff's Complaint as asserting a "HRL cause of action," but does not specifically identify the nature of the state law claim(s) or argue that it is entitled to summary judgment on those claim(s). Rather, Defendant argues that, because it is entitled to summary judgment with regard to Plaintiff's Title VII claims, the Court should decline to exercise supplemental jurisdiction over Plaintiff's NYSHRL claim(s). (Dkt. No. 24, Attach. 1, at 22-23.)

However, in the Court's view, Plaintiff has not asserted a Title VII discrimination claim. In her Complaint, Plaintiff expressly alleges, in her "First Cause of Action," that Defendant discriminated against her based upon her gender "in violation of the New York Executive Law also known as the New York Human Rights Law" (i.e., that she was subjected to disparate treatment). (Dkt. No. 1 at ¶¶ 27-31.) Plaintiff's Complaint makes no reference to Title VII (or any other federal law) with regard to the "First Cause of Action." (*Id.*) In contrast, in her "Second Cause of Action," Plaintiff's Complaint cites both Title VII and the NYSHRL and alleges two separate claims: (a) a claim that she was subjected to retaliation after she "fil[ed] discrimination charges" and "voic[ed] her concerns"; and (b) a claim that Defendant created a hostile work environment "for the purpose or with the foreseeable effect of causing [her] to leave her employment." (*Id.* at ¶¶ 32-36.)[21]

Based upon the foregoing, the Court concludes that Plaintiff's Complaint did not raise a Title VII discrimination claim until she filed her opposition to Defendant's motion for summary judgment. As a result, the Court declines to reach any such claim. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Kwan's complaint does not assert a claim for hostile work environment and Kwan did not raise the prospect of such a claim until her opposition to the motion for summary judgment. The District Court held that because the plaintiff had never asserted a claim of hostile work environment until her brief in opposition to the motion for summary judgment, it would not consider the claim. We agree with the District Court and will not address the merits of that late-asserted claim.") (citing, *inter alia*, *Syracuse Broad. Corp. v.*

---

[21]     In addition to the fact that Plaintiff's Complaint unambiguously casts her discrimination claim in the "First Cause of Action" as arising under only the NYSHRL, the Court notes that, "[b]ecause Plaintiff here is represented by counsel, h[er] pleadings are not entitled to the special solicitude afforded to *pro se* litigants." *Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 274 (W.D.N.Y. 2013).

*Newhouse*, 236 F.2d 522, 525 [2d Cir. 1956] [holding that district court was "justified" in "brush[ing] aside" further argument not alleged in complaint but raised for first time in opposition to summary judgment]).

### 2. Parties' Briefing on Defendant's Motion

### a. Defendant's Memorandum of Law

With respect to Plaintiff's Title VII retaliation claim, Defendant asserts five arguments: (1) to the extent that this claim is based upon acts that took place before August 25, 2011 (i.e., more than 300 days before she filed her amended verified complaint with NYSDHR/EEOC), that claim is time-barred and the continuing violation exception to the statute of limitations does not apply (Dkt. No. 24, Attach. 1, at 14); (2) any claims related to incidents that occurred prior to her August 18, 2011, contract grievances did not involve protected activities (*id.* at 14-15); (3) Plaintiff has not suffered an employment action that was materially adverse; (4) Plaintiff is unable to establish a causal connection between any retaliatory acts and a protected activity (*id.* at 15-16); and (5) any actions taken by Defendant were supported by nonretaliatory reasons, specifically, her repeated failure to adequately perform her job responsibilities as an Regional IT Manager, her mismanagement which occasioned problems not experienced in other regions, and her failure to follow instructions from her supervisors (*id.* at 17-18).

With respect to Plaintiff's Title VII hostile work environment claim, Defendant asserts two arguments: (1) the acts Plaintiff alleges were not sufficiently severe or pervasive to make out a prima facie claim (*id.* at 20-22); and (2) Plaintiff has not established that any of the actions taken by Defendant's employees was the result of a discriminatory motive or purpose (*id.* at 22).

Finally, Defendant argues that, upon dismissal of her Title VII claims, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. (*Id.* at 22-23.)

### b.      Plaintiff's Opposition Memorandum of Law

In opposition to Defendant's motion, Plaintiff asserts seven arguments: (1) her claims are timely because they are "based on the hostile work environment created against her as a result of her gender," rather than a single discrete act (Dkt No. 32, Attach. 1 at 6-7 [Plf.'s Opp'n Memo. of Law]; (2) her complaints of harassment to her supervisors and her complaints communicated through the grievance procedures provided for in her union contract constituted protected activities (*id.* at 8-9); (3) she has suffered a materially adverse employment action in that she was (a) stripped of her position as Regional IT Manager and transferred to a position in an area in which she had "no experience or knowledge," (b) assigned a small cubicle not commiserate with her grade and position, (c) subjected to the supervisor who transferred her (Bennison) "walking past her new cubicle to sneer and laugh at her," (d) subjected to progressive discipline regarding "attendance and tardiness" that had occurred in the past, and (e) denied her requests to "be transferred from her current position" (*id.* at 8-12); (4) her disparate treatment as compared to her male coworkers and the temporal proximity between her complaints of discrimination and her subsequent transfer, discipline, and attempted termination demonstrate a causal connection between her protected activity and the adverse employment actions she suffered (*id.* at 12-13); (5) Defendant has not proffered a legitimate nondiscriminatory reason for its actions toward Plaintiff and, to the extent that Defendant argues that Plaintiff was a poor and/or insubordinate employee, a question of material fact exists as to whether those reasons were pretextual (*id.* at 13-15); (6) she was subjected to a hostile work environment at the hands of Bennison (*id.* at 16-18); and (7) because Defendant's motion for summary judgment should be denied, there is no basis on which to dismiss her NYSHRL claims on jurisdictional grounds (*id.* at 21-22).

### c. Defendant's Reply Memorandum of Law

In its reply, Defendant asserts four arguments: (1) none of the actions allegedly taken by Defendant against Plaintiff, including her reassignment in July 2011, constituted an adverse employment action under the circumstances; (2) Plaintiff has not established that any of Defendant's alleged acts were undertaken with a retaliatory animus; (3) in any event, Defendant has offered valid, nondiscriminatory reasons for its alleged actions, including Plaintiff's inadequate job performance in light of the specific needs of the Region 1 office and the commonplace nature of reassignments due to reorganization of IT services statewide, as well as hiring and budgeting issues; and (4) Plaintiff has failed to address alternative explanations for her alleged treatment that she herself identified, including "mutual disagreements over work-related issues, complaints that Mr. Bennison had received about Plaintiff's management of Region 1, work backlog and deadline issues in Region 1, and challenges Plaintiff had made to Mr. Bennison's authority."  (Dkt. No. 34 at 1-3 [Def.'s Reply Memo. of Law].)

## II.     RELEVANT LEGAL STANDARDS

### A.     Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2).  As the

Supreme Court has explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e).

Under the above-stated burden-shifting standard, where the non-movant wilfully fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court has no duty to perform an independent review of the record to find proof of a factual dispute. However, in finding the facts asserted by movant to be true, the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record

support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Finally, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Legal Standards Governing Plaintiff's Claims

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the general legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which is intended primarily for review by the parties. (*See generally* Dkt. No. 24, Attach. 1 [Def.'s. Memo. of Law]; Dkt. No. 32, Attach. 1 [Plf.'s Opp'n Memo. of Law]; Dkt. No. 34 [Def.'s Reply Memo. of Law].) Rather, the Court will merely reference portions of those standards where necessary below in Part III of this Decision and Order.

## III.    ANALYSIS

### A.    Whether Plaintiff's Title VII Retaliation Claim Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons set forth in Defendant's memoranda of law.  (Dkt. No. 24, Attach. 1 [Def.'s Memo. of Law]; Dkt. No. 34 [Def.'s Reply Memo. of Law].)  More specifically, as discussed below, the Court agrees with Plaintiff that she engaged in a protected activity and that she has adduced admissible record evidence supporting a reasonable finding that her reassignment and notice of discipline were adverse employment actions.  However, the Court agrees with Defendant that Plaintiff has failed to adduce admissible record evidence supporting a reasonable finding of the necessary causal connection between her protected activities and the adverse employment actions.  Moreover, Defendant has presented legitimate, nondiscriminatory reasons for the adverse employment actions it took.  (Dkt. No. 24, Attach. 1, at 17-18; Dkt. No. 34 at 2.)

As an initial matter, Plaintiff correctly argues, and Defendant does not dispute, that she engaged in a protected activity when she filed contract grievances in August 2011.[22]  (Dkt. No. 32, Attach. 1, at 8-9 [Plf.'s Opp'n Memo. of Law]; Dkt. No. 24, Attach. 1 at 14-15 [Def.'s Memo.

---

[22]    While Plaintiff also asserts that she first complained about Bennison to Geraldine Smith (a representative in DOT's Employee Relations Bureau) in September 2008, but she does not assert that she specifically complained to Smith that Bennison was subjecting her to gender discrimination.  (Dkt. No. 32, Attach. 1, at 9.)  Moreover, Plaintiff acknowledges that her written communications with Smith did not refer to gender discrimination.  (Dkt. No. 32, Attach. 2, at ¶ 86.)  As a result, the Court is not persuaded that those complaints, which preceded her contract grievances, constituted protected activities. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."); *accord, e.g., Douglass v. Rochester City Sch. Dist.*, 522 F. App'x 5, 8 (2d Cir. 2013) (summary order) (holding that, although plaintiff's letter to a human relations officer requesting a change in supervisor characterized the supervisor "as having a brusque manner and volatile temperament, it would not have placed a reasonable employer on notice that [plaintiff] thought the alleged mistreatment was motivated by race or gender").

of Law].)  Plaintiff also gave testimony and furnished documents in support of her contract

grievances in October 2011.  Moreover, filing a formal complaint with NYSDHR–a step taken

by Plaintiff here in February 2012 and June 2012–also constitutes a protected activity.  (Dkt. No.

24, Attach. 2, at ¶¶ 162, 177.)  *See, e.g., Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.

1990).[23]

With regard to the element of adverse action, for the reasons articulated in Plaintiff's

memorandum of law, the Court concludes that a genuine issue of material fact exists as to

whether Plaintiff's reassignment from her position as the IT Regional Manager of Region 1 to the

Information Security unit constituted a materially adverse employment action.[24]  (Dkt. No. 32,

---

[23]     As Defendant correctly notes, "[a]n aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act."  *Petrosino v. Bell Atlantic*, 385 F.3d 210, 219 (2d Cir. 2004).  Here, Defendant's allegedly retaliatory acts do not fall outside that period.  However, the Court notes that it may consider events that occurred before that period as background evidence to timely-filed claims.  *Petrosino*, 385 F.3d at 220 (citing, *inter alia, Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 [2002]).

[24]     However, the Court concludes that the other actions alleged by Plaintiff were part and parcel of her reassignment (for example, her loss of accesses and security clearances related to her Regional IT Manager position) and/or simply not "'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Wright v. Monroe Comm. Hosp.*, 493 F. App'x. 233, 236 (2d Cir. 2012) (summary order) (quoting *Fairbrother v. Morrison*, 412 F.3d 39, 56 [2d Cir. 2005]).  Moreover, the Court notes that "[d]istrict [c]ourts within the Second Circuit have often found . . . that reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."  *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 520 (N.D.N.Y. 2013) (D'Agostino, J.) (citation and internal quotation marks omitted); *accord, Collazo v. Cnty. of Suffolk*, 12-CV-2196, 2016 WL 660856, at *17 (E.D.N.Y. Feb. 17, 2016); *Eustache v. Home Depot U.S.A., Inc.*, 13-CV-0042, 2014 WL 4374588, at *33 (E.D.N.Y. Sept. 2, 2014) ("Even under the more lenient standard applied in retaliation cases, courts have found that counseling memoranda do not qualify as adverse employment actions."); *Cody v. Cnty. of Nassau*, 345 F. App'x. 717, 719 (2d Cir. 2009) (concluding that "(1) falsely accusing [plaintiff] of being absent without authorization, (2) threatening her with future counseling notices and disciplinary actions, (3) writing her up for leaving work early, (4) placing her on a medical review list, (5) issuing her a counseling notice while she was on leave, and (6) engaging in a pattern of conduct that created a hostile working environment including altercations" did not constitute adverse employment actions for purposes of a retaliation claim).  Moreover, to the extent that she asserts that she has requested, and Defendant has denied, her requests to be transferred to another position, Plaintiff cites no record evidence reflecting any such request, any denial, or the timing, frequency, or reasoning for any such request and/or denial.  For these reasons, in addition to those set forth in Defendant's memorandum of law, the Court concludes that these actions were not materially adverse employment actions.

Attach. 1, at 11.)  Plaintiff has proffered evidentiary support for her assertion that she was

reassigned from her managerial position in Region 1, which carried supervisory responsibilities,

to a position with which she had less (if any) familiarity and training.  (*See, e.g.,* Dkt. No. 33 at ¶

33 [Plf.'s Aff.].)  *See also Kessler v. Westchester Cnty. Dept. of Soc. Servs.*, 461 F.3d 199, 209

(2d Cir. 2006) (holding that "a transfer is an adverse employment action if it results in a change

in responsibilities so significant as to constitute a setback to the plaintiff's career," where

plaintiff "was transferred from an 'elite' unit to one that was 'less prestigious,' or where the

transfer at issue "effected a 'radical change in nature of the [plaintiff's] work'") (citations

omitted); *Lore v. City of Syracuse*, 670 F.3d 127, 170 (2d Cir. 2012) (collecting cases).  That

Plaintiff maintained the same salary is of little consequence because, "even where a plaintiff

retains the same title and salary following a transfer, [s]he may demonstrate an adverse action by

showing that [s]he has been *de facto* 'stripped of [her job] responsibilities and not allowed to

perform those functions.'"  *Torregiano v. Monroe Comm. College*, 11-CV-6300, 2015 WL

6641784, at *12 (W.D.N.Y. Oct. 28, 2015) (quoting *Kessler*, 461 F.3d at 209).  Moreover, the

Court agrees with Plaintiff  that her April 2012 interrogation and subsequent notice of discipline,

proposing to terminate her employment due to her theft of services from May and June 2011,

could also constitute an adverse employment action.  (Dkt. No. 21, Attach. 1, at 12.)[25]

---

[25]        Ordinarily, the issuance of a notice of discipline "without any further evidence regarding
a materially adverse effect thereof" does not constitute an adverse employment action.  *Morales v. New
York State Dep't of Labor*, 865 F. Supp. 2d 220, 244 (N.D.N.Y. 2012) (Mordue, J.); *accord, Cotterell v.
Gilmore*, 64 F. Supp. 3d 406, 425 (E.D.N.Y. 2014) (holding that plaintiff's notice of discipline did not
qualify as an adverse employment action "because DEC did not pursue the notice of discipline nor was it
ever adjudicated under the CBA").  However, the mere fact that the notice of discipline proposing to
terminate Plaintiff was ultimately dismissed after arbitration proceedings does not establish as a matter of
law that it was not materially adverse.  *See, e.g., Abraham v. Potter*, 494 F. Supp. 2d 141, 148-49 (D.
Conn. 2007) (rejecting employer's argument that employee did not suffer an adverse employment action
because his suspension was ultimately reduced, and explaining that such a holding "would allow
employers who have violated Title VII by subjecting an employee to an adverse employment action with
discriminatory intent to avoid sanctions by nullifying the adverse employment action at a later date");

However, for the reasons set forth in Defendant's memorandum of law and reply memorandum of law, the Court concludes that Plaintiff has failed to establish that a genuine issue of material fact exists with regard to any causal connection between the protected activities in which Plaintiff engaged and the adverse employment actions to which she may have been subjected.  (Dkt. No. 24, Attach. 1, at 16-17 [Def.'s Memo. of Law]; Dkt. No. 34 at 2 [Def.'s Reply Memo. of Law].)  To those reasons, the Court adds the following analysis.

"[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Zann Kwan*, 737 F.3d at 845 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 [2013]).  "'[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"  *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 [2d Cir. 2000]).

Plaintiff asserts that the record in general demonstrates that she "was treated differently from her male coworkers."  (Dkt. No. 32, Attach. 1, at 13 [Plf.'s Opp'n Memo. of Law].)  Moreover, in opposition to Defendant's motion, Plaintiff has adduced two similar affidavits,

---

*accord, Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72 (2006) ("[T]hroughout its history, Title VII has provided for injunctions to bar like discrimination in the future, an important form of relief. And we have no reason to believe that a court could not have issued an injunction where an employer suspended an employee for retaliatory purposes, even if that employer later provided backpay.  In any event, Congress amended Title VII in 1991 to permit victims of intentional discrimination to recover compensatory . . . and punitive damages, concluding that the additional remedies were necessary to help make victims whole.  We would undermine the significance of that congressional judgment were we to conclude that employers could avoid liability in these circumstances.") (citations and internal quotation marks omitted).

sworn to by two of Plaintiff's former Regional IT Manager colleagues, Robert Hug (former Regional IT Manager for Region 10) and Timothy Weigel (former Regional IT Manager for Region 2). (Dkt. No. 32, Attach. 4 [Hug Aff.]; Dkt. No. 32, Attach. 5 [Weigel Aff.].) In his affidavit, Hug asserts as follows. Bennison treated Plaintiff "differently than" other Regional IT Managers, inasmuch as, during IT-related meetings, Bennison "dismissed" Plaintiff's contributions and "instantly berated" her. (Dkt. No. 32, Attach. 4, at ¶ 2.) Based upon Hug's experiences at work meetings, video conferences, and "other business occurrences," Bennison treated Plaintiff in a "disrespectful, belittling, harassing and relentless manner." (*Id.* at ¶ 10.) Bennison "ridiculed" her for employing two practices that were also used by other Regional IT Managers, specifically, "serving satellite offices" with IT needs by having staff members who lived nearby stop at those locations while en route to or coming from work, and visiting other satellite offices to assess the offices' needs in person, from a managerial perspective. (*Id.*, ¶¶ 5-7.) Based upon these observations (and the "numerous occasions" on which he spoke to Plaintiff"), Hug opined that Bennison acted in this manner because Plaintiff was a woman. (*Id.* at ¶¶ 3, 10.)

In his affidavit, Weigel opines that, between 2008 and 2011 (when Weigel retired), Bennison "regularly and continually discriminated against [Plaintiff] because of her gender." (Dkt. No. 32, Attach. 5, at ¶ 5.) Weigel bases this opinion, in part, on his assertion that Plaintiff "confided in [him] with many of the issues she was experiencing with [Bennison] in the last few years of" Weigel's employment, including Bennison's "unruly demands" of Plaintiff, her observation that Bennison "was excessively viewing her NYSDOT GroupWise calendar, and Bennison's directive that Plaintiff "handle walk in's [*sic*] to her office immediately, which was contrary to normal protocol." (*Id.* at ¶ 6.) Weigel asserts that Bennison "boasted that he could

manage [Plaintiff's] region far better than she could," but did not make similar claims with regard to male Regional IT Managers, and that Bennison "yell[ed] at and berate[d]" Plaintiff during a video conference in front of other employees.  (*Id.* at ¶¶ 8-9.)  Weigel opines that Bennison's conduct was gender-based because male Regional IT Managers were not similarly treated, and that Bennison intended to "creat[e] a hostile work environment[.]"  (*Id.* at ¶ 12.)

Additionally, in opposition to Defendant's motion, Plaintiff adduced an affidavit sworn to by Kayla Biltucci, who asserts as follows.  (Dkt. No. 32, Attach. 3 [Biltucci Aff.].)  While Biltucci was serving as "the head of a newly formed Office of Effectiveness and Efficiency," Bennison was "put in charge of the Office of Right of Way," in which Biltucci was also "Bureau Director of Appraisal and the Agency's Chief Appraiser."  (*Id.* at ¶ 2.)  Bennison used "some of the tactics" as alleged by Plaintiff in his interactions with Biltucci.  (*Id.*)  Bennison "avoided meeting with" Biltucci, never devoted any time to discussing important policy issues with her, "superceded [her] supervision of [her] direct reports," "took away [her] office," and assigned her to a cubicle.  (*Id.* at ¶¶ 2-3.)  Bennison "attacked [Biltucci] in emails and in person with subtle and overt abuses, which included continuous and unreasonable demands . . . talking down to [her], exercising an unreasonable supervision over [her] and excluding [her] from appropriate, management level meetings with [her] peers."  (*Id.* at ¶ 5.)  At some unspecified point, Biltucci "made the acquaintance of" Plaintiff through "a mutual colleague," and they shared details about their mistreatment by Bennison.  (*Id.* at ¶¶ 8-9.)  Biltucci explained to Plaintiff that Biltucci was "experiencing similar angry and offensive behaviors" from Bennison, "mostly in the form of off putting, bullyish tactics, avoidance of meeting with" her, and unreasonable work demands.  (*Id.* at ¶ 9.)

However, Plaintiff identifies no evidence to support her conclusory assertion that Defendant retaliated against her because she *filed contract grievances and/or NYSHRL complaints*, or that similarly situated employees were not subject to adverse employment actions for engaging in the same behavior. *See, e.g., Cook v. CBS, Inc.*, 47 F. App'x. 594, 596 (2d Cir. 2002) (summary order) ("Cook has not presented evidence sufficient to show that he was treated differently from other employees who engaged in similar conduct, and he has presented no direct evidence of retaliatory animus."); *Stroud v. New York City*, 374 F. Supp. 2d 341, 351 (S.D.N.Y. 2005) (concluding plaintiff failed to identify proof of retaliatory animus on the basis of disparate treatment, and noting that "[m]ere conclusory statements are not substitutes for proof"); *cf. DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (holding that "proof of causal connection can be established" by "evidence such as disparate treatment of fellow employees who engaged in similar conduct," and that plaintiff had done so in that case by offering evidence that he was a plaintiff in a Title VII action, that his employment was later terminated, and that "fellow employees . . . were not disciplined for engaging in identical behavior"). Although Hug asserted that Bennison's "parade of orders and invasive methods of oversight increased dramatically when [Plaintiff] filed [a] complaint and a grievance against him," he offered no detail as to which "complaint" he was referring, how Bennison's conduct toward Plaintiff escalated after she filed a "complaint," or the basis of his knowledge (admissible or otherwise) of these facts.[26] (Dkt. No. 32, Attach. 4, at ¶ 10.) Nor did Hug assert that he

---

[26]    Indeed, to the extent that Hug and/or Weigel assert that Bennison's conduct toward Plaintiff became even more inappropriate after she filed her grievances, it is unclear how either would have personal knowledge of facts supporting that conclusion. Plaintiff filed her grievances after she was removed from her managerial role, stripped of her duties, and transferred to Nagy's unit at the main office. The record does not support the conclusion (and Plaintiff does not assert) that she continued participating in conference calls and/or video conferences with Bennison and other Regional IT Managers after she was removed from Region 1.

engaged in similar behavior but was treated differently. Weigel's affidavit contains an averment nearly identical to that found in Hug's affidavit: Bennison's "parade of orders and invasive methods of oversight" increased following Plaintiff's grievance. (Dkt. No. 32, Attach. 5, at ¶ 12.) However, like Hug, Weigel did not elaborate with specificity or identify the basis of his knowledge, nor did Weigel assert that he was treated differently after engaging in any activity similar to that engaged in by Plaintiff.

With regard to temporal proximity, it is undisputed that the PEF filed contract grievances on Plaintiff's behalf in August 2011. (Dkt. No. 24, Attach. 2, at ¶ 139.) However, she learned in a meeting that she was being reassigned to the main office to work under Nagy in July 2011. (*Id.* at ¶¶ 121-22.) Although Plaintiff apparently did not report to work at the main office for the first time until September 2011, she was informed that she was being reassigned before her grievances were filed. Based upon the inverted timing with regard to this protected activity (i.e., the filing of contract grievances alleging discrimination) and this adverse employment action (i.e., the reassignment of Plaintiff), temporal proximity does not support the existence of a causal connection between these events. *See, e.g., Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (concluding that "an inference of retaliation d[id] not arise" based upon temporal proximity where the employer diminished defendant's job responsibilities before he engaged in any protected activity); *Harder v. New York*, 117 F. Supp. 3d 157, 170 (N.D.N.Y. 2015) (Hurd, J.) ("[G]iven that Harder's DHR complaint was not filed until . . . well after the events occurred at OCFS, this protected activity cannot be the causal basis for any of the retaliatory acts described by plaintiff."); *Croons v. New York State Office of Mental Health*, 18 F. Supp. 3d 193, 208 (N.D.N.Y. 2014) (Hurd, J.) (concluding that no causal connection existed where the adverse employment action occurred prior to plaintiff filing his complaint).

Turning to Plaintiff's interrogation and subsequent notice of discipline, it is undisputed that Plaintiff did not receive notice that she was required to appear for an interrogation regarding her earlier attendance issues until three months after her contract grievances were filed in August 2011, and that interrogation was not conducted until April 2012.  (Dkt. No. 24, Attach. 2, at ¶¶ 157, 168; Dkt. No. 24, Attach. 9, at 247].)  "'[D]istrict courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line.'"  *Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *16 (N.D.N.Y. Feb. 16, 2016) (Suddaby, C.J.) (quoting *Ruhling v. Tribune Co.*, 04-CV-2430, 2007 WL 28283, at *23 [E.D.N.Y. Jan. 3, 2007]).  The delay between the filing of Plaintiff's contract grievances and her receipt of notice of the interrogation was more than two months; the delay until the interrogation was actually held was much greater.[27]

Similarly, Plaintiff received notice of the interrogation *before* she filed her original NYSHRL complaint in February 2012, a fact which undercuts an inference that, in pursuing its investigation, Defendant was acting in retaliation against her for filing the complaint.  (Dkt. No. 24, Attach. 2, ¶ 162; Dkt. No. 24, Attach. 23, at 1622-31.)  The temporal proximity of these

---

[27]     Moreover, while it is true that Plaintiff provided testimony in support of her grievances in October 2011 (approximately one month before she first received the notice of interrogation related to her earlier attendance issues), documents in the record reflect that staff from the Employee Relations Bureau were actively investigating Plaintiff's attendance and tardiness by surveilling her in May 2011 and June 2011 (again, before her contract grievances were filed).  (Dkt. No. 24, Attach. 9, at 227-38 [attaching as part of "Exhibit D" signed statements of Dave Harris, Sheila Dillinger, and Bernadette Ellis].)  Accordingly, the fact that the notice of interrogation more closely followed Plaintiff's testimony and submission of records regarding her grievances is not circumstantial evidence of retaliatory causation. *See, e.g., Forest v. New York State Office of Mental Health*, 13-CV-1762, 2015 WL 6965149, at *9 (S.D.N.Y. Nov. 10, 2015) ("The May 5, 2012 Notice of Discipline for filling out and signing inaccurate forms was issued shortly after plaintiff's April 2012 DHR Complaint, but it was the result of a review process that had begun on March 1, 2012, prior to the April complaint. . . . Therefore, the fact that the Notice closely followed the Complaint is not circumstantial evidence of retaliatory causation in this case.").

events does not support the conclusion that Defendant acted with retaliatory intent.[28]

Even if Plaintiff were able to set forth a *prima facie* case of retaliation, however, Defendant has presented legitimate, nondiscriminatory reasons for the adverse employment actions it took for the reasons stated in Defendant's memoranda of law.  (Dkt. No. 24, Attach. 1, at 17-18 [Def.'s Memo. of Law]; Dkt. No. 34 at 2 [Def.'s Reply Memo. of Law].)  Moreover, "Plaintiff has not provided any evidence suggesting that the performance [and attendance] issues identified by Defendant were merely pretext for" retaliating against her.  *Lehtinen v. Town of Greenport*, 12-CV-0393, 2014 WL 3477037, at *11 (N.D.N.Y. July 11, 2014) (D'Agostino, J.); *accord, Ehrbar v. Forest Hills Hosp.*, 13-CV-1761, 2015 WL 5568830, at *25 (E.D.N.Y. Sept. 22, 2015) ("[B]eginning in 2009, Plaintiff's supervisors routinely raised similar issues with her performance and demanded that she make corrections. . . . Because Plaintiff fails to raise additional evidence that these reasons are pretext, no reasonable jury could find that but-for Plaintiff's letter to Dowling, her employment would not have been terminated."); *Jacob v. NYSARC, Inc.*, 13-CV-1677, 2014 WL 6750654, at *12 (S.D.N.Y. Dec. 1, 2014) ("[N]either Plaintiff nor the record provides any evidence of pretext, or any evidence that other, similarly situated employees not in Plaintiff's protected class were treated differently despite similar work performance issues.").

Here, although Plaintiff identifies Bennison as the singular source of her unfair treatment, the record supports the conclusion that her performance and attendance-related issues, as

---

[28]     The Court notes that Plaintiff's conclusory assertion that she "had not received any counseling or discipline prior to her complaints of gender based discrimination" is belied by the record.  (Dkt. No. 32, Attach. 1, at 13.)  Plaintiff was counseled by her supervisor (Lewis) in March 2009 regarding two separate issues, one related to her failure to communicate with the main office and the other related to failure to provide Lewis information about one of her employees.  (Dkt. No. 24, Attach. 2, at ¶¶ 49-50.)

detailed above, have also been addressed on multiple occasions by Plaintiff's direct supervisors, both before and after her reassignment. (*See, e.g.,* Dkt. No. 24, Attach. 2, at ¶¶ 49-50 [indicating that Lewis counseled Plaintiff in March 2009]; Dkt. No. 24, Attach. 2, at ¶¶ 96-99 [indicating that Lewis communicated with Plaintiff regarding Region 1's lack of progress in completing cellular phone upgrade]; Dkt. No. 24, Attach. 16, at 927 [containing e-mail message from Lewis to Plaintiff, stating that "[t]he complaints coming in, whether right or wrong, are coloring the opinion of the capabilities of IT in the region and the management thereof . . . ensure that coverage [at the Training Center] is a high priority at all times"]; Dkt. No. 24, Attach. 2, at ¶¶ 165-67 [indicating that Nagy counseled regarding her attendance and work habits].) *See also Betterson v. HSBC Bank, USA, N.A.*, 11-CV-0615, 2015 WL 6157594, at *13 (W.D.N.Y. Sept. 30, 2015) (observing that "all of Plaintiff's supervisors . . . testified that Plaintiff had significant problems in the areas of customer service, responsiveness, timely completion of initiatives, and accountability").

For all of the foregoing reasons, the Court concludes that Plaintiff has not presented sufficient evidence from which a reasonable juror could conclude that Defendant retaliated against her under Title VII. Plaintiff's Title VII retaliation claim is therefore dismissed.

**B.      Whether Plaintiff's Title VII Hostile Work Environment Claim Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative for each of the reasons stated in Defendant's memorandum of law. (Dkt. No. 24, Attach. 1, at 20-22 [Def.'s Memo. of Law].) In addition to those reasons, the Court makes two points.

First, while the record supports the conclusion that Bennison may have been impatient, brusque, demanding, and difficult with Plaintiff, the Court concludes that, for the reasons stated

by Defendant, Bennison's alleged conduct was not, as a matter of law, sufficiently severe or pervasive to create an abusive working environment. *See, e.g., Marshall v. NYC Bd. of Elections*, 322 F. App'x 17, 18-19 (2d Cir. 2009) (summary order) ("Marshall's allegations that her supervisor displayed a violent temper, stood over her with clenched fists on several occasions, disparaged her educational background, and engaged in crass behavior are troubling. But Title VII is not a 'general civility code for the American workplace;' it prohibits only harassment that is discriminatory.'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 [1998]); *Bir v. Pfizer, Inc.*, 510 F. App'x 29, 32-33 (2d Cir. 2013) (summary order) (concluding that summary judgment was appropriate where supervisor allegedly "falsely accused [plaintiff] of antagonizing her customers and lying about her schedule," "reduced her budget for educational programs," "screamed" at her, "assigned her less desirable sales territory" than her male comparators, and subjected her to more frequent "field-visit supervisions," and with less warning, than her male comparators); *see generally Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.").[29]

---

[29] Nor does Biltucci's affidavit (which Plaintiff does not, in any event, rely upon in asserting her argument concerning her hostile work environment claim) provide a basis upon which a reasonable juror could conclude that Plaintiff suffered the severe and/or pervasive, gender-based treatment that Title VII proscribes. "The Second Circuit recognizes that remarks made outside a plaintiff's presence and harassment directed at co-workers can be relevant to a hostile work environment claim." *Campbell v. Cnty. of Onondaga*, 04-CV-1007, 2009 WL 3163498, at *21 (N.D.N.Y. Sept. 29, 2009) (Mordue, C.J.). However, such secondhand remarks "are not as impactful on one's environment as are direct statements; consequently, they are less persuasive in stating a hostile work environment claim." *Sletten v. LiquidHub, Inc.*, 13-CV-1146, 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014). While Biltucci asserts that she

Second, it is worth noting that none of the comments or conduct attributed by Plaintiff to Bennison (or, for that matter, to any other DOT employee) outwardly reflect in any way that they were made or undertaken *because of* Plaintiff's gender.[30]  *See, e.g., Lynch v. Nat'l Fuel Gas Dist. Corp.*, 25 F. Supp. 3d 358, 364 (W.D.N.Y. 2014) (citing *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15-16 [2d Cir. 2013]) ("[W]here, as here, the comments and conduct alleged and/or proved are entirely gender-neutral, plaintiff has failed to adequately plead, let alone raise a triable question of fact concerning, a hostile work environment claim."); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 672 (S.D.N.Y. 2012) (concluding that incidents asserted by Plaintiff over a four-year period–including being "cursed at," "yelled at," "having paper thrown at her," having her complaints ignored, being falsely accused of "vacation policy violations," fraud, theft, and embezzlement, and "being harassed, verbally abused and humiliated to illness"–were insufficiently severe or pervasive to create hostile work environment; further concluding that, in any event, the record did not support conclusion that plaintiff was subjected to this treatment because of her gender, even though plaintiff was asked to complete tasks not asked of other professionals, asserted that she never witnessed a doctor

was subjected to "off putting, bullyish tactics" from Bennison akin to those suffered by Plaintiff, it is somewhat unclear when this mistreatment occurred relative to Plaintiff's alleged experiences.  (Dkt. No. 32, Attach. 3, at ¶ 10.)  It appears that Plaintiff and Biltucci had no other interaction with one another, were not present during each other's interactions with Bennison, were not present when Bennison made remarks about the other, and would not have known each other but for the introduction by their unnamed "mutual colleague" on an unspecified date.  (*Id.* at ¶ 8.)  In short, Plaintiff has not established that Biltucci's alleged treatment contributed to the creation of a hostile work environment against *Plaintiff*.

[30]     Plaintiff asserts that she was "continuously" chastised by Bennison, and that he would "regularly" tell her to "shut up" and "ignore her comments, suggestions, or issues" that she raised during conference calls.  (Dkt. No. 33 at ¶ 8 [Plf.'s Aff.].)  However, there is little indication how frequently this actually occurred, or how often conference calls were held in which Bennison treated Plaintiff in this manner.  Plaintiff also does not provide specificity with regard to the manner of the language used by Bennison toward Plaintiff, other than that he told her to "shut up."  Fully crediting Plaintiff's assertion that Bennison "regularly" acted in this manner, the record provides no indication that Bennison ever referred even obliquely to Plaintiff's gender or ever used gender-based epithets or other vulgarities.

"verbally abuse any coworker except [herself], the only African-American female dentist" at the practice, and submitted an affidavit from a female African-American dental assistant asserting that a doctor also "yelled at" her on a particular date).

Nevertheless, to the extent that Plaintiff's hostile work environment claim is premised upon the proposition that other Regional IT Managers–all of whom were male–were not subjected to the same alleged harassing behavior of Bennison, "[f]acially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Alfano*, 294 F.3d at 378; *accord, Raspardo v. Carlone*, 770 F.3d 97, 121 (2d Cir. 2014) ("We have previously recognized that plaintiffs may present circumstantial proof that adverse treatment was not explicitly sex-based was, nevertheless, suffered on account of sex.") (citation and internal quotation marks omitted). "This requires, however, 'some circumstantial or other basis for inferring that incidents [that are] neutral on their face were in fact discriminatory.'" *Davis-Molinia v. Port Authority of New York and New Jersey*, 08-CV-7584, 2011 WL 4000997, at *12 (S.D.N.Y. Aug. 19, 2011), *aff'd,* 488 F. App'x 530 (2d Cir. 2012) (quoting *Alfano*, 294 F.3d at 378). Notably, the Second Circuit has explained that "*Alfano*'s observation that 'incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination' presumed evidence of 'multiple acts of harassment, *some overtly sexual and some not*,'" and that the "failure to point to evidence of any act infected by [an impermissible] bias . . . compels summary judgment in favor of defendants[.]" *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 759 (2d Cir. 2008) (summary order) (emphasis added); *accord, Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010) ("A plaintiff may rely on incidents of sex-based abuse to show that other ostensibly

sex-neutral conduct was, in fact, sex-based.") (citing *Raniola v. Bratton*, 243 F.3d 610, 621-22 [2d Cir. 2001]).

In this case, the only evidence offered in support of Plaintiff's own assertions that these facially gender-neutral incidents were actually gender-based consists of two highly similar affidavits submitted by two of Plaintiff's former Regional IT Manager colleagues, Hug and Weigel. (Dkt. No. 32, Attach. 4 [Hug Aff.]; Dkt. No. 32, Attach. 5 [Weigel Aff.].) As stated earlier, Hug asserts that, in his opinion, Bennison treated Plaintiff "differently than" other Regional IT Managers, inasmuch as, during IT-related meetings, Bennison "dismissed" Plaintiff's contributions and "instantly berated" her. (Dkt. No. 32, Attach. 4, at ¶ 2.) Hug opined that Bennison mistreated Plaintiff because she was a woman, and based that opinion on his experiences at work meetings, video conferences, and "other business occurrences," as well as the "numerous occasions" on which he spoke with Plaintiff, during which they discussed Bennison's actions toward Plaintiff. (Dkt No. 32, Attach. 4, at ¶¶ 3, 10.) Weigel held the same opinion, based upon, in part, the fact that Plaintiff "confided in [him] with many of the issues she was experiencing with [Bennison] in the last few years of" Weigel's employment, including Bennison's "unruly demands" of Plaintiff, her observation that Bennison "was excessively viewing her NYSDOT GroupWise calendar, and Bennison's directive that Plaintiff "handle walk in's [*sic*] to her office immediately, which was contrary to normal protocol." (Dkt. No. 32, Attach. 5, at ¶ 6.) Weigel asserted that Bennison "boasted that he could manage [Plaintiff's] region far better than she could," but did not make similar claims with regard to male Regional IT Managers, and that Bennison "yell[ed] at and berate[d]" Plaintiff during a video conference in front of other employees. (*Id.* at ¶¶ 8-9.)

As an initial matter, those portions of the affidavits reciting aspects of Plaintiff's alleged mistreatment that the affiants learned of from conversations with Plaintiff constitute inadmissible hearsay.  (Dkt. No. 32, Attach. 4, at ¶ 3 [Hug Aff., asserting that Hug had "spoken" with Plaintiff "on numerous occasions" about Bennison's "erroneous expectations," reviewing Plaintiff's "calendar on a regular basis," his "nonsensical request that she be at her office desk 100% of the time," and his "continuous investigations into her everyday routine activities"]; Dkt. No. 32, Attach. 5, at ¶ 6 [Weigel Aff., asserting that Plaintiff "confided in" him regarding "her belief that Mr. Bennison was inserted as a member of [Plaintiff's] Service Center account" and was "excessively viewing her NYSDOT GroupWise calendar"].)  *See also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Woods*, 288 F. App'x at 759; *accord, DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012).  Moreover, the affidavits are otherwise conclusory not only with respect to the source of the affiants' knowledge, but also with respect to the conduct (and its frequency) that they opine was sex-based.  (Dkt. No. 32, Attach. 5, at ¶ 6 [Weigel Aff., citing without specificity Bennison's "unruly demands and orders" directed at Plaintiff]; Dkt. No. 32, Attach. 4, at ¶ 5 [Hug Aff., opining, without factual support by reference to staffing in his own region or any other evidence, that Bennison "intentional[ly] understaff[ed]" Plaintiff's office], ¶ 10 [citing Bennison's "parade of orders"].)

Even if the affidavits are considered in full, however, they still do not suffice to circumstantially establish the allegedly gender-based nature of Bennison's conduct because there is no other evidence of overtly gender-based acts that a factfinder might weigh to determine whether this harassment was directed at Plaintiff because of her gender.  *Woods*, 288 F. App'x. at

759; *accord*, *Bir*, 510 F. App'x at 32-33 (complained-of actions, including assigning plaintiff "less-desirable sales territory" than male comparators and subjecting her to "more frequent field-visit supervisions," and with less warning, than male comparators, were "facially sex-neutral"); *cf. Pucino*, 618 F.3d at 118-19 (concluding that facially sex-neutral incidents, including "denial of overtime," could provide the basis for an inference of gender discrimination when considered in combination with sex-based "verbal attacks," including use of the word "bitch," an "intensely degrading sexual epithet"); *Raniola*, 243 F.3d at 622 ("By virtue of the sex-based comments made by Captain Kissik," including the word "c—" written across Raniola's name "in an official police ledger" and another derogatory term "displayed on a poster advertising a police event, a reasonable jury could infer that the other abuse Raniola suffered was also on account of sex."); *Piston v. Cnty. of Monroe*, 08-CV-6435, 2012 WL 4490652, at *10 (W.D.N.Y. Sept. 27, 2012) (finding an issue of fact existed where supervisor subjected plaintiff to "screaming rants on a daily basis" in the presence of male coworkers, in addition to calling her a "bitch" several times and "commenting on her brassiere in front of her male colleagues during a meeting").

Accordingly, Plaintiff's Title VII hostile work environment claim is dismissed.

## C. Whether Plaintiff's State Law Claims Should Be Dismissed on Jurisdictional Grounds

Defendant argues that the Court should decline to exercise supplemental jurisdiction over all of Plaintiff's NYSHRL claims on the basis that Plaintiff's Title VII claims must be dismissed. (Dkt. No. 24, Attach. 1, at 22-23.) Plaintiff argues only that, because she has adduced evidence raising a genuine dispute of material fact as to her Title VII claims, her state law claims should not be dismissed on jurisdictional grounds. (Dkt. No. 32, Attach. 1, at 21 [Plf.'s Opp'n Memo. of Law].)

As a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or Congress has validly abrogated that immunity. *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984); *Tillery v. NYS Office of Alcohol & Substance Abuse Servs.*, 13-CV-1528, 2014 WL 2434954, at \*5 (N.D.N.Y. May 30, 2014) (Kahn, J.) ("Defendant correctly points out that 42 U.S.C. § 2000d-7[a][1], which abrogates sovereign immunity for violations of *federal* antidiscrimination statutes, applies only to federal causes of action rather than suits arising under state law."); *Quadir v. New York State Dep't of Labor*, 39 F. Supp. 3d 528, 537-38 (S.D.N.Y. 2014) ("New York has not waived its Eleventh Amendment immunity for NYSHRL suits in federal courts.") (citations, internal quotation marks, and alterations omitted) (collecting cases); *Robinson v. New York*, 08-CV-0908, 2010 WL 301910, at \*3 (W.D.N.Y. Jan. 19, 2010) (explaining that "New York State has not consented to suit against it under the HRL in federal court," and that Plaintiff's "HRL claims against the State [and] its agencies" were therefore barred by the Eleventh Amendment). Here, there has been neither waiver nor abrogation.

Accordingly, Plaintiff's NYSHRL claims against DOT, a stage agency, are barred and therefore dismissed.[31]

---

[31] To the extent that Plaintiff's administrative charges filed with the NYSDHR/EEOC were closed for administrative convenience, the Court notes that it rendered a finding in *Collins v. DOCCS*, 07-CV-0493, 2012 WL 2563029, at \*2 (N.D.N.Y. June 29, 2012) (Suddaby, J.) inconsistent with the finding rendered in the present case. In *Collins*, DOCCS argued that plaintiff's NYSHRL claim was barred due to sovereign immunity under the Eleventh Amendment. *Collins*, 2012 2563029, at \*1. However, this Court interpreted NYSHRL § 297(9) to mean that, "where a complaint to the [DHR] is dismissed for administrative convenience, there is no jurisdictional bar to an action in federal court based on the same aggrieved unlawful discriminatory practice." *Id.* at \*2 (citing *Moodie v. Fed. Reserve Bank of N.Y.*, 58 F.3d 879, 883-84 [2d Cir. 1995]). Other courts that have considered *Collins* have disagreed with this interpretation, holding instead that, "[r]ather than effecting a waiver or sovereign immunity, . . . [NYSHRL § 297(9)] simply places an individual who has received a dismissal of his NYSDHR complaint for the reasons set forth in the statute[, including administrative convenience,] in the same procedural

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 24) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court shall issue a Judgment for Defendants and close

this action.

Dated:      March 24, 2016
             Syracuse, NY

                                          Hon. Glenn T. Suddaby
                                          Chief U.S. District Judge

---

posture that individual would have been in had that individual not initially chosen to proceed before the [DHR]." *Korzeniewski v. New York*, 12-CV-0727, 2013 WL 6148076, at *3 (W.D.N.Y. Nov. 22, 2013); *accord, Alessi v. DOCCS*, 16 F. Supp. 3d 221, 225 (W.D.N.Y. 2014). After careful reflection, the Court agrees with the latter interpretation of NYSHRL § 297(9) and holds that a plaintiff's DHR complaint that is dismissed for administrative convenience does not waive sovereign immunity.